**In re Dorsey CHRISTIAN, Jr., Debtor.**

**Bankruptcy No. 94 B 25154.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Aug. 23, 1996.

Steven B. Bashaw, Richard S. Lauter, McBride, Baker & Coles, Chicago, Illinois, for Citibank.

Jeffrey M. Weston, Chicago, Illinois, for IMFL.

Melvin J. Kaplan, Bennett Kahn, Chicago, Illinois, for debtor.

Craig Phelps, Chapter 13 Standing Trustee, Chicago, Illinois.

### AMENDED MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Bankruptcy Judge.

Section 1322(c)(1) of the Bankruptcy Code (Title 11, U.S.C.) states that Chapter 13 plans may provide for the cure of any default in a mortgage on the debtor's principal residence until the point at which the "residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law." In Illinois, foreclosures of residential real estate are governed by the Illinois Mortgage Foreclosure Law (the "IMFL"), 735 ILCS 5/15–1101 to –1706 (1994). The IMFL provides, at Section 1507, for a "judicial sale," and, at Section 1508, for subsequent entry of a court order confirming the sale, after which a deed issues to the purchaser. The Chapter 13 case before this court intervened between a judicial sale of the debtor's residence, under the IMFL, and the confirmation of that sale, and two motions now pending in this case ultimately raise the same question: at what point in the foreclosure process established by the IMFL is a debtor's residence "sold at a foreclosure sale," within the meaning of Section 1322(c)(1)?

The debtor, taking the position that his residence was not "sold" until entry of the confirmation order, asserts that by seeking entry of that order, during the pendency of this case, the mortgagee and the purchaser at the judicial sale violated the automatic stay imposed by Section 362(a) of the Bankruptcy Code. On this basis, the debtor has filed a motion seeking both sanctions against the mortgagee and purchaser, and, effectively, a declaration that the order of confirmation entered by the state court is void. The mortgagee and purchaser, on the other hand, assert that debtor's residence was "sold" at the judicial sale, causing a termination of the debtor's right to cure the mortgage default in Chapter 13, and hence that their participation in the confirmation hearing was at most a technical violation of the automatic stay. The mortgagee has accordingly moved for annulment of the stay, with the effect of retroactively validating the confirmation order.

For the reasons set forth below, the court determines that the debtor's property was "sold" for purposes of Section 1322(c)(1) at the judicial sale, rather than by entry of the confirmation order, so that, after the sale, the debtor had no interest in the property that could be advanced by this bankruptcy case. Accordingly, the court grants the motion for annulment of the automatic stay and denies the motion for sanctions.

### Jurisdiction

The pending motions, one to annul and the other to enforce the automatic stay, are specifically authorized, respectively, by Sections

362(d) and 362(h) of the Bankruptcy Code, and exist only in the context of a bankruptcy case. They are therefore proceedings "arising under title 11" and "arising in a case under title 11," as set forth in 28 U.S.C. § 1334(b). *In re Wolverine Radio Co.,* 930 F.2d 1132, 1144 (6th Cir.1991). The district court has jurisdiction over such proceedings, and may refer them to bankruptcy judges, pursuant to 28 U.S.C. § 157(a). By General Rule 2.33(a), the District Court for the Northern District of Illinois has made such a reference. Bankruptcy judges are given authority to enter appropriate orders and judgments in core proceedings arising in bankruptcy cases by 28 U.S.C. § 157(b)(1). The pending motions are core proceedings. 28 U.S.C. § 157(b)(2)(G) (including motions to annul the automatic stay in a listed category of core proceedings); *Price v. Rochford,* 947 F.2d 829, 832 n. 1 (7th Cir.1991) (holding that motions to enforce the automatic stay are core proceedings).

### Findings of Fact

The facts relevant to the pending motions are not in dispute. The debtor in this Chapter 13 case, Dorsey Christian, Jr., bought a home in 1977, and financed it through a purchase money mortgage, securing a note in the amount of $55,000. By April 1994, Christian had defaulted in payments under the note, and the holder of the mortgage note, Citibank, F.S.B. ("Citibank") filed a complaint to foreclose the mortgage in state court, pursuant to the Illinois Mortgage Foreclosure Law. Christian ultimately responded to the foreclosure proceeding by filing the pending Chapter 13 case, on December 21, 1994. Christian filed with his bankruptcy petition a plan providing (1) that he would make payments to the Chapter 13 trustee, which would be used to cure the default in his mortgage and pay the claims of other creditors, and (2) that he would also make current mortgage payments directly to Citibank.

The plan was confirmed on March 15, 1995, but Christian had difficulty in complying with its terms. On June 6, 1995, Citibank filed a motion seeking to modify the automatic stay, on the ground that Christian had failed to make four current monthly mortgage payments and one payment to the trustee. That motion was resolved by an agreement between Christian and Citibank. Six months later, on December 6, 1995, the Chapter 13 trustee presented a motion to dismiss the case, alleging that Christian was four months behind in trustee payments under the plan. This motion to dismiss was granted.

Following the dismissal, Citibank pursued its foreclosure action in state court, and a judicial sale of Christian's home was conducted on January 26, 1996. Illinois Real Estate Opportunity Fund I, L.L.C. (the "Opportunity Fund") was the purchaser. That same day, Christian's attorneys served notice of a motion, to be presented in this court, to vacate the order dismissing the bankruptcy case, stating that Christian then had the funds necessary to become current in his plan payments to the Chapter 13 trustee.

On February 7, 1996, the court heard Christian's motion to vacate the dismissal. At the hearing, counsel for Citibank opposed the motion to vacate on the ground that, after the foreclosure sale, Christian had no interest in his home that could be protected in the Chapter 13 case, citing this court's decision in *In re Josephs,* 85 B.R. 500 (Bankr.N.D.Ill.), *aff'd,* 93 B.R. 151 (N.D.Ill. 1988). Christian's counsel replied that she had been unaware of the judicial sale at the time she prepared the motion to vacate, but asked that the case be reinstated to allow the debtor to pay creditors other than Citibank. Citibank's counsel, in turn, agreed to this relief, as long as it was clear that vacating the order of dismissal would not have the effect of invalidating the judicial sale. A provision to that effect was included in the order granting the debtor's motion, which was then entered without objection.

Following vacation of the order of dismissal, Citibank filed a motion in state court to confirm the judicial sale—without previously obtaining relief from the automatic stay. The hearing on this motion was continued at Christian's request, to enable him to obtain counsel, but ultimately, on March 13, 1996, the state court entered an order confirming the judicial sale. That same day, a deed for the home was issued to the Opportunity Fund.

The Opportunity Fund thereafter evicted Christian from the property, spent about $27,000 in repairing it, and ultimately, on May 15, 1996, entered into a contract to sell the property to another party. That contract is currently scheduled to close in early August.

On July 11, 1996, Christian, now represented by substitute bankruptcy counsel, gave notice of the pending motion for sanctions against Citibank and the Opportunity Fund, alleging that their participation in the confirmation hearing violated the automatic stay. Citibank and the Opportunity Fund have opposed the motion, and Citibank has filed a motion to annul the automatic stay.

## Conclusions of Law

*The meaning of "cure".* The issue raised by this case requires, at the outset, an understanding of what it means to "cure" a default in a secured claim through a Chapter 13 plan.

● The Bankruptcy Code generally provides, under Section 506(a), for the "bifurcation" of secured claims. If a creditor has a claim against the debtor, secured by collateral that is property of the bankruptcy estate, and the value of the collateral is not sufficient to pay the entire claim, then the creditor is seen as having two claims in the bankruptcy case: first, a secured claim, to the extent of the value of the collateral (or, in the language of Section 506(a), "the extent of the value of such creditor's interest in the es-

tate's interest in such property") and second, an unsecured claim to the extent that there is a deficiency in the value of the collateral ("the extent that the value of such creditor's interest [in the estate property] is less than the amount of such allowed claim.").

● Debtors in Chapter 13 are given two distinct methods for dealing with the rights of creditors holding secured claims: "modification" and "cure." The principal difference between the two is whether "strip down" is allowed. "Modification," as provided by Section 1322(b)(2), allows the debtor to "strip down" a secured creditor's claim to the secured claim that results from bifurcation under Section 506(a), and then pay that claim, over the course of the Chapter 13 plan, at a market rate of interest.[1] In contrast, "cure," as provided for by Section 1322(b)(3) and (5), leaves most of the terms of the underlying loan agreement in effect, and merely allows the debtor to reverse any acceleration of the loan, caused by default, so that the debtor can "catch up" on the defaulted amounts while maintaining current payments.[2]

● For long term debts, secured only by a lien on the debtor's principal residence—like the claim of Citibank in the present case—Section 1322(b)(2) expressly eliminates the option of modifying the secured creditor's rights. *Nobelman v. American Savings Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) (holding that claim secured only by a lien on the debtor's principal

---

1. Section 1322(b)(2) allows a Chapter 13 plan to "modify the rights of holders of secured claims." Section 1325(a)(5), in turn, sets out minimum standards for such a modification. If the debtor does not surrender the collateral and if the creditor does not agree to different terms, Section 1325(a)(5)(B) requires that the creditor receive property under the plan having a value "as of the effective date of the plan," not less than the amount of the "allowed secured claim." The legislative history indicates that the "allowed secured claim" referred to in this provision is the claim that results after the bifurcation of Section 506(a), and the courts have so interpreted it. 124 Cong. Rec. H11, 107 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards setting forth results of conference committee), *reprinted in* Appendix 3 Collier on Bankruptcy IX–122 (15th ed. 1993); *In re Dinsmore,* 141 B.R. 499, 508 (Bankr.W.D.Mich.1992). Thus, "modification" allows a Chapter 13 debtor to "strip down" a secured claim to the value of the collateral that

supports it. *In re Flowers,* 175 B.R. 698 (Bankr. N.D.Ill.1994), *aff'd sub nom. Bank One v. Flowers,* 183 B.R. 509 (N.D.Ill.1995). Because the payments under the plan must equal the value of the secured claim "as of the effective date," market interest is required. 11 U.S.C. § 1325(a)(5)(B)(ii); *In re Bellamy,* 962 F.2d 176, 185–86 (2d Cir.1992).

2. This process is set forth explicitly in Section 1322(b)(5), which deals with long term indebtedness (claims "on which the last payment is due after the date on which the final payment under the plan is due"). It is also possible to cure defaults in short term secured claims, under Section 1322(b)(3). *In re Taddeo,* 685 F.2d 24, 27 (2d Cir.1982); *Grubbs v. Houston First American Savings Ass'n,* 730 F.2d 236, 237 (5th Cir.1984) (en banc); *In re Clark,* 738 F.2d 869, 872 (7th Cir.1984); *In re Roach,* 824 F.2d 1370, 1376 (3d Cir.1987).

residence cannot be "stripped down" to the value of the collateral). Thus, the only way in which such a claim can be treated by a Chapter 13 plan is through a cure of default, with maintenance of current payments, pursuant to Section 1322(b)(5), as the Dorsey Christian proposed in this case.

*The legal background of Section 1322(c)(1).* The ability of a Chapter 13 plan to "cure" defaults in mortgage loans raises the question of when in the process of a mortgage foreclosure it is no longer possible for that cure to take place. This question was ultimately addressed by Section 1322(c)(1) of the Bankruptcy Code, enacted as part of the Bankruptcy Reform Act of 1994. Prior to that enactment, a number of court decisions had to address the question of cure cutoff in the absence of any express statutory guidance. These decisions are collected and discussed in *In re Hurt,* 158 B.R. 154, 156–58 (9th Cir. BAP 1993).

As noted in *Hurt,* the courts developed a number of different rationales for establishing a cutoff of the right to cure. The Seventh Circuit's decisions—*In re Clark,* 738 F.2d 869, 871 (7th Cir.1984) (applying Wisconsin law); and *In re Tynan,* 773 F.2d 177 (7th Cir.1985) (applying pre-IMFL Illinois law)—employed state law to determine the cutoff point, and established that the right to cure "is extinguished when the foreclosure process reaches a point at which the pre-foreclosure relationship between the mortgagor and mortgagee has ended, so that it can be said that the mortgagor's title has effectively been transferred and that there is no longer any mortgage to cure." *In re Josephs,* 85 B.R. 500, 504 (Bankr.N.D.Ill.), *aff'd,* 93 B.R. 151. (N.D.Ill.1988). In *Josephs,* 85 B.R. at 506, this court held that, under the IMFL, this point was reached at the time of the foreclosure sale, a holding later adopted in *In re Beaty,* 116 B.R. 112 (Bankr.N.D.Ill. 1990). Employing differing rationales, other circuits also concluded that a foreclosure sale marked the cutoff of the right to cure a mortgage default. *In re Thompson,* 894 F.2d 1227, 1229 (10th Cir.1990) (rejecting state law as governing, and basing decision on the concept of "property of the estate" under the Bankruptcy Code); *In re Glenn,*

760 F.2d 1428, 1435–36 (6th Cir.1985) (basing decision on "pragmatic" considerations); *cf. Justice v. Valley Nat'l Bank,* 849 F.2d 1078, 1085 (8th Cir.1988) (interpreting a parallel provision in Chapter 12 to allow for cure of mortgages until the "contractual relationship" between the parties ends, as determined by state law).

All of these decisions, made it clear that by "foreclosure sale," they meant the event (usually an auction) through which a third party may acquire an ownership interest in the debtor's property, even though title may not actually pass at that point. Thus, in *Tynan,* 773 F.2d at 178, and *Justice,* 849 F.2d at 1084, the debtor retained a right to redeem the property after such a sale, so there was no immediate passing of title, but the sale itself was sufficient to terminate the relationship that had previously existed between the debtor and the mortgagee and preclude a cure under the Bankruptcy Code. In *Thompson,* 894 F.2d at 1230, and *Glenn,* 760 F.2d at 1435, the courts pointed to the fact that the "foreclosure sale" potentially introduced a third party—the foreclosure purchaser—into what had previously been a relationship exclusively between the debtor and the mortgagee. *Glenn* went on to note that setting the cutoff date later than the time of the "foreclosure sale" on the debtor's property "brings with it the very serious danger that bidding at the sale . . . will be chilled." 760 F.2d at 1436. The Ninth Circuit Bankruptcy Appellate Panel, in *Hurt,* similarly held that the foreclosure sale—understood as the event allowing third-party purchase of the debtor's property—should be the cutoff point for a cure of mortgage arrearages. 158 B.R. at 160 ("The foreclosure sale introduces a third party when, as here, the property is purchased by someone other than the mortgagee.").

Of all the circuit courts to rule on the question, only the Third Circuit held that a point other than the foreclosure sale should be the cutoff for cure under Section 1322(b)(5), and that court held, based on state law considerations, that the cutoff should be at the earlier point of a foreclosure judgment. *In re Roach,* 824 F.2d 1370, 1377 (3d Cir.1987) and *First Nat'l Fidelity Corp.*

*v. Perry,* 945 F.2d 61, 63, 65 (3d Cir.1991) (each holding, in the context of New Jersey law, that once a foreclosure judgment is entered, there is no contractual relationship left to cure).

*The meaning of Section 1322(c)(1).* The legal context that preceded enactment of Section 1322(c)(1) is thus fairly clear: a substantial majority of cases held that the right to cure a mortgage default in Chapter 13 terminated at the time the debtor's property was put up for sale to third parties—the time of the "foreclosure sale"—while the Third Circuit held that the right terminated earlier, at the entry of an order of foreclosure. In this context, the language of Section 1322(c)(1), that a default in a mortgage on the debtor's principal residence "may be cured ... until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law," is most reasonably seen as adopting the majority position.

The legislative history of Section 1322(c)(1) is consistent with this reading. Senator Grassley, in presenting the Bankruptcy Reform Act of 1994, explained Section 1322(c)(1) as follows:

> Some homeowners attempt to prevent their homes from being foreclosed upon, even though a bankruptcy [*sic*, should be "state"] court has ordered a foreclosure sale. There may be several months between the court order and the foreclosure sale. Section [1322(c)(1)] will preempt conflicting State laws, and permit homeowners to present a plan to pay off their mortgage debt until the foreclosure sale actually occurs.

140 Cong.Rec. S14462 (1994). The report of the House Judiciary Committee issued in connection with the Act (1) states that "Section 1322(b)(3) and (5) of the Bankruptcy Code permit a debtor to cure [mortgage]

defaults," (2) notes the conflict between the Third Circuit's *Roach* decision and the decisions of the other circuit courts regarding when this right terminates, (3) states that *Roach* "is in conflict with the fundamental bankruptcy principle allowing the debtor a fresh start," and (4) reads Section 1322(c)(1) as allowing the debtor to cure mortgage arrearages under Chapter 13 "at least through completion of a foreclosure sale under applicable nonbankruptcy law." H.R.Rep. No. 835, 103d Cong., 2d Sess. 33–34 (1994), U.S.Code Cong. & Admin.News 1994, pp. 3340, 3341–43.[3]

Since the "foreclosure sale" in the present case took place prior to the time of the Dorsey Christian's bankruptcy filing, Section 1322(c)(1) does not allow his plan to cure the arrearage in his mortgage to Citibank.

*The McEwen decision.* In arguing against this conclusion, Christian relies principally on a recent decision of the local district court, *McEwen v. Federal National Mortgage Ass'n,* 194 B.R. 594 (N.D.Ill.1996). In *McEwen,* the court considered the identical issue raised by the present case, and reached a conclusion contrary to the one set out above, holding that the cutoff for cure of mortgage arrearages under Section 1322(c)(1) should be, in the context of the IMFL, the time of confirmation of the judicial sale. This decision is entitled to substantial deference, but as the opinion of a single judge in a multi-judge district, it cannot establish precedent for the district binding on the bankruptcy courts, *City of Olathe v. KAR Development Associates (In re KAR),* 180 B.R. 629, 640 (D.Kan.1995) (collecting authorities), and, on three distinct grounds, *McEwen* is not persuasive.

First, as noted above, the judicial decisions that preceded enactment of Section 1322(c)(1) established that "foreclosure sale" should be the cutoff for cure under Section

**3.** The House report goes on to suggest, contrary to the holdings to *Tynan* and *Justice,* that a Chapter 13 debtor should be allowed to cure a mortgage default after the conclusion of a foreclosure sale "if the State provides the debtor more extensive 'cure' rights (through, for example, some later redemption period)." Whether this suggestion is consonant with the actual language of Section 1322(c)(1) is a question that

need not be reached here, since under the IMFL a debtor has no right to "cure" mortgage arrearages after a foreclosure sale. To the contrary, the debtor's rights are expressly terminated prior to the foreclosure sale. 735 ILCS 5/15–1507(b) (judicial sale to be conducted "[upon expiration of the reinstatement period and the redemption period]"); 735 ILCS 5/15–1605 (no equitable right of redemption after judicial sale).

1322(b)(5) of the Bankruptcy Code, and these opinions understood "foreclosure sale" as the event at which a third party may acquire an interest in the debtor's property. The *McEwen* decision suggests that these opinions are irrelevant to an understanding of the meaning of Section 1322(c)(1) because that section establishes a "new right to cure a default," distinct from the "older and less specific ... right-to-cure" established by Section 1322(b)(5). 194 B.R. at 596. This suggestion is mistaken. Section 1322(c)(1) expressly states that it affects the cutoff date for the right to cure established by Section 1322(b)(3) and (5), and the H.R.Rep. No. 835, as quoted above, states the same understanding. Hence, the prior decisions establishing that the cutoff for cure under Section 1322(b)(5) was the "foreclosure sale" are, in fact, highly relevant in establishing the meaning of "foreclosure sale" in Section 1322(c)(1).

Second, *McEwen* relies on a decision of the Illinois Appellate Court—*Citicorp Savings v. First Chicago Trust Co.*, 269 Ill.App.3d 293, 206 Ill.Dec. 786, 645 N.E.2d 1038 (1995)—for the proposition that a judicial sale under the IMFL is not "complete" until entry of a judicial order of confirmation. 194 B.R. at 596. This decision, however, is not relevant to the interpretation of Section 1322(c)(1) of the Bankruptcy Code. *Citicorp Savings* holds that a circuit court properly declined to confirm a judicial sale that was held "by mistake," based on a provision of the IMFL (735 ILCS 5/15–1508(b)(iv)) that confirmation may be denied if "justice was ... not done."

269 Ill.App.3d at 300, 206 Ill.Dec. at 793, 645 N.E.2d at 1045. In this connection, the *Citicorp Savings* decision states that "[t]he highest bid received by a sheriff at a judicial sale is merely an irrevocable offer to purchase the property and acceptance of the offer takes place when the court confirms the sale," so that "[u]ntil the court confirms the sheriff's proceedings, there is not a true sale in the legal sense." *Id.* This language is not necessary to the decision, and does not appear to be an accurate description of the operation of the IMFL; the only authority cited in its support are two depression-era decisions of the Illinois Supreme Court dealing with a substantially different foreclosure law.[4]

■ Regardless of the accuracy of the *Citicorp Savings* dicta, however, the question of when a foreclosure sale is "final" under state law does not determine when a debtor's residence has been "sold at a foreclosure sale" under Section 1322(c)(1) of the Bankruptcy Code. As noted earlier, it might be said that no sale is "final" until title actually passes, but that was not the understanding of "foreclosure sale" that led to Section 1322(c)(1). That understanding—that the "sale" takes place at the end of the process of selecting a purchaser, potentially a third party—is reflected in the *Citicorp Savings* decision itself, which describes the property in question as having been "sold by the sheriff at a mortgage foreclosure sale." 269 Ill. App.3d at 294, 645 N.E.2d at 1041. That decision, moreover, holds that the interests of purchasers arising from a judicial sale are sufficient to allow them a right to intervene

---

**4.** The two decisions cited by *Citicorp Savings* in support of its statements regarding the lack of finality of judicial sales are *Levy v. Broadway–Carmen Building Corp.*, 366 Ill. 279, 8 N.E.2d 671 (1937); and *Straus v. Anderson*, 366 Ill. 426, 9 N.E.2d 205 (1937). The principal issue in each of those decisions was whether, under the then extant Illinois mortgage foreclosure law, a chancery court had the authority to refuse to approve a sale conducted by a master in chancery on the sole ground that the sale price was inadequate. The Illinois Supreme Court focused on the lack of finality of the master's sale in order to distinguish these sales from other types of judicial sales (such as sales under executions), as to which it had been held that "mere inadequacy of price," without fraud or other impropriety, was not enough to disturb the sale. *Levy*, 366 Ill. at 283–84, 287–88, 8 N.E.2d at 673–74, 676;

*Straus*, 366 Ill. at 431–32, 9 N.E.2d at 208. There is no similar need for judicial sales under the IMFL to be distinguished from other types of judicial sales, since the IMFL itself allows for denial of confirmation where the sale price is "unconscionable." 735 ILCS 5/15–1508(b)(ii). Moreover, the IMFL states that "upon entry of a judgment of foreclosure, the real estate which is the subject of the judgment *shall be sold at a judicial sale* in accordance with this Section 15–1507." 735 ILCS 5/15–1507(a) (emphasis added). The procedures of Section 15–1507 do not include judicial confirmation. Thus, in contrast to the *Citicorp Savings* dicta, the IMFL appears to consider property "sold" when the purchaser is selected (by auction or otherwise), even though the sale may be nullified if a court later denies confirmation.

in the confirmation proceedings. 269 Ill. App.3d at 298–99, 645 N.E.2d at 1043–44. Similarly, the IMFL provides that the purchaser at a judicial sale is entitled, prior to confirmation, to a recordable and assignable certificate of sale. 735 ILCS 5/15–1507(f). It is the acquisition of such rights to mortgaged property, potentially by a third party, that marks the "foreclosure sale" in the sense of Section 1322(c)(1).

Third, deference to state law actually requires that judicial sale under the IMFL, rather than the later confirmation, be deemed the cutoff point for cure of mortgage defaults through a Chapter 13 plan. One of the principal reasons for the changes in Illinois mortgage foreclosure law made by the IMFL was to increase the prices obtained at foreclosure sales. Catherine A. Gnatek, *The New Mortgage Foreclosure Law: Redemption and Reinstatement*, 1989 U.Ill.L.Rev. 471 (1989). The IMFL seeks to accomplish this goal by eliminating any right to redeem the property after the judicial sale, thus giving bidders a substantial assurance of prompt possession of the property after the sale. *Id.* at 486–87; Liss, *Introduction to the Proposed Illinois Mortgage Foreclosure Act*, 9 Ill.Fund Concept 13, 14 (1985). If, after the sale, any mortgagor has the power to suspend or nullify the sale through a Chapter 13 plan, this assurance of prompt possession is eliminated.

*The impact of an inability to cure on the automatic stay.* As noted at the outset of this discussion, Chapter 13 offers debtors two options for the treatment of secured claims: modification and cure. Because Citibank's claim in this case is secured only by a lien on the debtor's principal residence, modification was never an option available to Dorsey Christian. *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). The other option, cure of the mortgage default, was no longer available after the judicial sale in Citibank's foreclosure case. Thus, after the foreclosure sale, Chapter 13 provided no means for affecting Citibank's claim.

Nevertheless, Citibank should not have proceeded to confirmation of the sale without obtaining relief from the automatic stay imposed by Section 362 of the Code. Prior to the confirmation hearing, Christian had at least a possessory interest in his home, and that interest became property of the estate pursuant to Section 541(a) of the Code. Confirmation of the judicial sale was thus, at the very least, "the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the [bankruptcy] case," an act prohibited by Section 362(a)(2).

However, because Christian could not cure the default in his mortgage or modify Citibank's rights through his Chapter 13 plan, Citibank would have had cause for relief from the automatic stay, pursuant to Section 362(d) of the Code. Since Citibank did not seek this relief prior to initiating the confirmation proceeding, the question is now whether the court should grant that relief retroactively, by "annulling" the automatic stay, as also authorized by Section 362(d). Whether to grant such relief is a question addressed to the equitable discretion of the court. *In re Lipuma*, 167 B.R. 522, 526 (Bankr.N.D.Ill.1994). Here, the equities strongly favor annulment. First, Dorsey Christian, for the reasons set forth above, would have had no legitimate ground for opposing a timely motion for relief from stay, and hence the delay by Citibank has caused him no prejudice. Second, the colloquy at the hearing on Christian's motion to vacate dismissal of this case, in which Christian's counsel sought reinstatement only to allow payment of creditors other than Citibank, could reasonably have led Citibank's counsel to believe that Christian had no objection to the conduct of a confirmation hearing. Third, Christian made no attempt to stop the confirmation hearing, his eviction, or the subsequent improvements of his property by arguing that they violated the automatic stay, until after all of these actions were completed. Finally, Citibank and particularly the Opportunity Fund have taken substantial action in reliance on the effectiveness of the judicial sale of Christian's property—including the resale of that property to another party. Annulment of the stay is therefore appropriate.

## Conclusion

For the reasons stated above, the debtor's motion to enforce the automatic stay is denied, and the motion of Citibank, F.S.B. for annulment of the automatic stay is granted. Separate orders to this effect have been entered.